Joseph J. Saltarelli
HUNTON & WILLIAMS LLP
200 Park Avenue
New York, New York  10166
(212) 309-1000

Attorneys for Defendant New York
Independent System Operator, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

330 FUND I, L.P,

                        Plaintiff,

           - against -

NEW YORK INDEPENDENT SYSTEM
OPERATOR, INC.,

                  Defendant.

-----------------------------------------------------------X



**Judge Hellerstein**

**'07 CIV 6791**

<u>**NOTICE OF REMOVAL**</u>

**TO:**   **UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

       Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant New York Independent System

Operator, Inc. (the "NYISO"), by and through its undersigned attorneys, submits this Notice

of Removal and states as follows:

       1.     This action, bearing Index No. 07-602180, was commenced on June 29, 2007

in the Supreme Court of the State of New York, New York County, and is now pending.

       2.     The United States District Court for the Southern District of New York

embraces the place where the above-captioned action is pending.

3.      A copy of the Summons and Complaint was served upon the NYISO, by personal delivery within the State of New York, on June 29, 2007.

4.      No other parties have been joined or served as defendants in the above-captioned action.

5.      A copy of the Summons and Complaint, as served upon the NYISO, is annexed hereto and constitutes all process, pleadings, and orders served upon the NYISO in the state court action.

6.      The above-captioned action is a civil action for money damages brought in a State court of which the District Courts of the United States have original jurisdiction pursuant to 28 U.S.C. § 1331.  Although pleaded as state law claims, Plaintiff's claims arise under and are governed by tariffs filed by the NYISO with the Federal Energy Regulatory Commission ("FERC"), which tariffs have the force and effect of federal law.  Moreover, Plaintiff's claims implicate the "filed rate" to be paid pursuant to such tariffs, a matter over which FERC has exclusive jurisdiction pursuant to the provisions of the Federal Power Act. Indeed, the issues raised by Plaintiff in its Complaint are currently pending before FERC in a proceeding commenced by Plaintiff the day it filed this action, <u>330 Fund I, L.P. v. New York Independent System Operator, Inc.</u>, FERC Docket No. EL07-78-000.  Accordingly, this Court would have original subject matter jurisdiction over this action pursuant to the provisions of 28 U.S.C. § 1331, if the action were brought in federal court.  Removal of the action to this Court, therefore, is proper under 28 U.S.C. § 1441.

7.      This Notice of Removal is timely under 28 U.S.C. § 1446(b) because the Summons and Complaint was served upon the NYISO not earlier than June 29, 2007.

8.    Insofar as the NYISO is the sole defendant named herein, no consent from any co-defendant is required.

9.    Written notice of filing of this Notice of Removal will be given to Plaintiff, and a copy will be filed in the appropriate State court, as required by 28 U.S.C. § 1446(d).

Dated: New York, New York
       July 27, 2007


                              Respectfully Submitted,

                              HUNTON & WILLIAMS LLP


                              By: _Joseph Saltarelli_
                                  Joseph J. Saltarelli
                                  200 Park Avenue
                                  New York, New York 10166
                                  (212) 309-1000

                              Attorneys for Defendant New York
                              Independent System Operator, Inc.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

330 FUND I, L.P.

Plaintiff(s),

-against-

NEW YORK INDEPENDENT SYSTEM
OPERATOR, INC.

Defendant(s).

---

Index No. *07 602180*

**Summons**

Date Index No. Purchased: June 29, 2007

To the above named Defendant(s)

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is N.Y. C.P.L.R. 503, which is New York

Dated: June 29, 2007

by _Jonathan Beemer_
J. Christopher Shore
Jonathan Beemer
White & Case LLP
1155 Avenue of the Americas
New York, N.Y. 10036

Attorneys for Plaintiff
330 Fund I, L.P.

**NEW YORK
COUNTY CLERK'S OFFICE**

**JUN 29 2007**

**NOT COMPARED
WITH COPY FILE**

American LegalNet, Inc.
www.FormsWorkflow.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :

330 FUND I, L.P.,                                        Index No.
                  Plaintiff            :

        vs.                                 :

NEW YORK INDEPENDENT SYSTEM            COMPLAINT
OPERATOR, INC.,                            :

                  Defendant.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff 330 Fund I, L.P. ("330 Fund"), by its attorneys White & Case LLP, as and for its

Complaint against the New York Independent System Operator, Inc. ("NYISO") respectfully

alleges as follows:

## NATURE OF THE ACTION

        1.    This is an action brought by 330 Fund against the NYISO for its breach of certain

provisions of the New York Independent System Operator Open Access Transmission Tariff (the

"OATT") and various related bilateral contracts between 330 Fund and the NYISO.

        2.    The dispute herein centers on the NYISO's failure to notify 330 Fund and other

market participants as it was required to do of an April 2007 disconnection of the New York

Power Authority's two gas turbine electric generating units (known as the "Seymour GTs") from

their historic interconnection point, the installation of new transmission cable, the

interconnection of the Seymour GTs at a new interconnection point within a load pocket, and

associated transmission line outage(s) ("Interconnection Project"). Upon information and belief,

the NYISO knew of the Interconnection Project no later than April 7, 2006. The undisclosed

implementation of the Interconnection Project and the related outage of a portion of the State transmission grid substantially damaged 330 Fund.

3.    In the Fall of 2006 and Spring of 2007, prior to the Interconnection Project, the NYISO sold certain Transmission Congestion Contracts ("TCC") to 330 Fund in auctions conducted by the NYISO. TCCs incorporate the terms of the OATT. TCCs either obligate their holder to pay transmission congestion price differentials or costs or entitle their holder to receive such price differentials. Congestion costs arise when the price of electric power in two geographic areas differ because of limits on the ability of the transmission system to transport power freely between the two areas. As a result, prices may become higher in one area than the other area due to transmission "congestion."

4.    With the NYISO's knowledge, 330 Fund purchased TCCs which obligated 330 Fund to pay congestion costs between several defined points within New York City, and other TCCs which entitled 330 Fund to collect congestion differentials between other points within New York City. The Interconnection Project had a material negative impact on the TCCs which 330 Fund acquired in the Fall of 2006 and the Spring of 2007, long after the NYISO became aware of the Interconnection Project.

5.    Under the provisions of the OATT, the NYISO had a duty to disclose information concerning the Interconnection Project. The NYISO breached this duty. As a result of the NYISO's failure to disclose this information, 330 Fund's payments for congestion under certain TCCs were dramatically reduced and its obligations to pay congestion for other TCCs were dramatically increased. The NYISO's breach of the OATT provisions also breached the terms of the TCCs themselves.

6.    330 Fund also seeks recovery for defendant's negligence in failing to provide

timely and accurate information concerning the Interconnection Project. As the administrator of

the substantial NYISO TCC market and the party responsible for posting relevant market

information, the NYISO had an independent duty to post information sufficient to permit market

participants to make prudent business decisions concerning the NYISO administered markets.

Notwithstanding the fact that the NYISO had information concerning the Interconnection Project

long before the Fall 2006 and Spring and April 2007 TCC auctions, it failed to meet its duty to

provide adequate notice of the Interconnection Project to market participants, including 330

Fund.

## THE PARTIES

7.    330 Fund I, L.P. ("plaintiff" or "330 Fund") is a limited partnership organized

under the laws of the State of Delaware, with a principal place of business at 208 South LaSalle

Street, Suite 1880, Chicago, Illinois 60604. At least one of 330 Fund's limited partners has a

principal place of business in, and is domiciled in, the State of New York, County of New York.

8.    Defendant NYISO is a not-for-profit corporation organized under the laws of the

State of New York, with a principal place of business at 10 Krey Boulevard, Rensselaer, New

York 12144.

## STATEMENT OF FACTS

### Background

9.    The NYISO manages the electric transmission system in New York State. The

NYISO is responsible for administering the New York electric market, including the markets for

energy, transmission, ancillary services, and TCCs. As an integral part of administering the

market, the NYISO also provides marketplace data and other important information to market

participants who buy and sell electric energy and TCCs in the New York energy markets. The NYISO is regulated by the Federal Energy Regulatory Commission ("FERC").

10.    The NYISO auctions TCCs to electricity market participants under the OATT. The NYISO conducts periodic auctions and monthly reconfiguration auctions during which holders of TCCs may trade them to third parties.

11.    A TCC is a financial instrument that effectively operates as a hedge against energy price differences at different locations on the NYISO system. For example, a TCC with a point of injection at point A and a point of withdrawal at point B entitles the holder to collect or requires the holder to pay the energy price differential between those two points.

12.    Some of the TCCs at issue here are known as Counterflow TCCs. Counterflow TCCs require the TCC holder to pay the "day-ahead congestion" differential associated with each particular TCC's point of injection and point of withdrawal. A Counterflow TCC's point of injection represents the congested or higher priced side of the Counterflow TCC path, whereas the point of withdrawal represents the uncongested or lower priced side of the TCC path. The "day-ahead congestion" differential measures the difference in price between the point of injection and point of withdrawal for each hour of a given day based on clearing prices as determined by the NYISO in the day-ahead energy market.

### The 330 Fund TCCs

13.    330 Fund is an investment fund which invests in financial transmission rights and TCCs in northeastern independent system operators such as the NYISO. 330 Fund is active in the electricity-related financial markets administered by the NYISO.

14.    330 Fund participated in the NYISO Fall 2006 TCC auction. The NYISO awarded 330 Fund TCCs on 88 paths for a total of 638 megawatts at a face value of $7.6 million

for counterflow TCCs for the period from November 1, 2006 to April 30, 2007.  A megawatt or "MW" is a measure of the amount of electric power that can be generated or transmitted.  These counterflow TCCs had a Point of Injection ("POI") inside the Staten Island/Greenwood ("SI/G") Load Pocket which is located in lower Brooklyn and Staten Island.  Load pockets are congested areas of the system where there is not enough transmission capacity to serve the load in the area from generation outside the area and so local generation (which may be more expensive to run than power generated outside the area) in the area is required to serve the load.  The SI/G Load Pocket is such an area.  At times when the transmission into the area is fully loaded, prices inside the load pocket increase, thereby creating congestion with higher prices in the load pocket and lower prices outside the load pocket.  Counterflow TCCs oblige the TCC holder (in this case, 330 Fund) to pay the day-ahead congestion component differential between each TCC's point of injection (the congested or higher priced side of the counterflow TCC path) and point of withdrawal (the uncongested or lower priced side).  The NYISO also awarded 330 Fund 20 MW of paths with a Point of Injection at the Seymour GTs.

15.     In the Spring 2007 TCC Auction, 330 Fund took additional positions vis-à-vis the load pocket by acquiring 94 MW of ("predominant flow") TCCs with a face value of $9.9 million.  In addition, 330 Fund acquired 25 MW of TCCs with paths with a point of injection at the Seymour GTs, a point which was relocated, without advance notice, as a direct result of the Interconnection Project.  Unlike the counterflow TCCs, these additional TCCs had a Point of Withdrawal ("POW") in or near the SI/G Load Pocket.  These additional TCCs have a term ending October 31, 2007.  In contrast to the counterflow TCCs, these "predominant flow" TCCs entitle 330 Fund to collect the congestion costs between their points of injection outside the SI/G Load Pocket and the points of withdrawal inside the SI/G Load Pocket.

16.    The Greenwood-Gowanus N Transmission Line ("Line 42231") is one of the transmission lines which delivers electricity to the SI/G load pocket.  When this line was removed from service as part of the Interconnection Project, the price of electricity and congestion inside the SI/G Load Pocket increased, thereby increasing the obligations associated with 330 Fund's counterflow TCCs for the period ending April 30, 2007.

**The Seymour GTs**

17.    The New York Power Authority ("NYPA") is a state-owned organization which operates and administers power generating facilities and electricity transmission lines throughout New York State.

18.    The NYPA owns the Seymour GTs.  The Seymour GTs have a production capacity of approximately 93.4 megawatts of electricity and prior to completion of the Interconnection Project were interconnected to Line 42231.  As part of the Interconnection Project, the Seymour GTs were electrically moved to interconnect within the SI/G Load Pocket, which materially affected TCCs which the NYISO had already sold in the Fall 2006 and Spring and April 2007 TCC auctions.

**The NYPA's Proposed Reconfiguration Of The Seymour GTs**

19.    On April 7, 2006, the NYPA sent a letter to the NYISO notifying it that the NYPA wanted to disconnect the Seymour GTs from Line 42231, and run 3,500 feet of new line to interconnect the turbines at the Greenwood 138 kV substation within the SI/G Load Pocket (i.e., the Interconnection Project).

20.    In the letter, the NYPA requested that the NYISO find this planned reconfiguration of the Seymour GT interconnection to be a "non-material" modification.  The NYPA letter did not provide any information regarding the timing of the Interconnection Project

which would result from the Seymour GTs reconfiguration. The NYISO Transmission Planning Advisory Subcommittee ("TPAS") met on April 10, 2006 and concurred that the Interconnection Project was "non-material."

21.    The NYISO did not list the Interconnection Project in its listing of interconnection projects in a posted file known as the interconnection queue or post information concerning the Interconnection Project on its Open Access Same-Time Information System ("OASIS"), an information posting system which the NYISO is required to maintain under the OATT.

**The Line 42231 Outages**

22.    There were several transmission outages which were part of the Interconnection Project and which had a significant adverse impact on 330 Fund's TCCs. On April 4, 2007, Line 42231 was shown on the NYISO's daily outage schedule as being taken out of service starting April 9, 2007 through April 30, 2007. 330 Fund first contacted the NYISO on that same day seeking information about the outage, but received no immediate response.

23.    On or about April 5, 2007, the NYISO daily outage schedule was revised to indicate that Line 42231 would be out of service from April 11, 2007 through April 30, 2007.

24.    On April 11, 2007, Line 42231 was taken out of service, and was not returned to service until May 7, 2007.

25.    In an e-mail dated April 13, 2007, the NYISO declined to provide any details concerning the Line 42231 outage despite 330 Fund's multiple requests for such information.

26.    Prior to April 4, 2007, the NYISO did not list Line 42231 as being in an outage. Nor did the NYISO provide notice of the Line 42231 outage in its report preceding the April 2007 TCC reconfiguration auction which was completed in March, despite the fact that the NYISO knew the line was scheduled to be out for more than half of April 2007.

27.    Line 42231 was out from April 11 to May 7, 2007. Line 42231 also was out for four days between February 5 and February 8, then again on March 15, 2007. Upon information and belief, these outages, as well as a possible line de-rating beginning as early as December 2006, were caused by the Interconnection Project.

28.    The outage on Line 42231 from April 11, 2007 to May 7, 2007 was caused by the Interconnection Project.

29.    The Interconnection Project was planned by the NYPA in advance, and did not result from an emergency situation. The NYISO was aware of the Interconnection Project on or before April 10, 2006.

**Changes in Congestion Costs Resulting From the Interconnection Project Harmed 330 Fund**

30.    330 Fund acquired counterflow TCCs with a term ending April 30, 2007 and October 31, 2007 in the NYISO Fall 2006 auction, and "predominant flow" TCCs with a term ending October 31, 2007 and April 30, 2008 in the NYISO's Spring 2007 auction.

31.    Each of the Line 42231 outages had an immediate adverse pricing impact on 330 Fund. When Line 42231 was removed from service, the congestion payment obligations pursuant to 330 Fund's counterflow TCCs for the period ending April 30, 2007 increased dramatically, thereby harming 330 Fund. As noted, these outages occurred at several points in the period February through April 2007.

32.    In addition, the change in interconnection point for the Seymour GTs had an adverse economic impact on the 330 Fund's TCC position for the period commencing May 1, 2007, which it acquired in the NYISO's Spring 2007 TCC Auction. These TCCs are "predominant flow" TCCs with a point of withdrawal in the SI/G Load Pocket. When the Interconnection Project was completed, the Seymour GTs were moved into the SI/G Load

Pocket. This move had the effect of decreasing congestion costs within the load pocket. 330 Fund's TCCs with a term commencing May 1, 2007 entitle 330 Fund to collect the congestion cost within the load pocket. Consequently, the decrease in congestion in the SI/G Load Pocket decreased the revenues 330 Fund was entitled to collect under its TCCs.

33.    The NYISO's failure to subject the Interconnection Project to certain OATT requirements and to post related information has caused 330 Fund to incur substantial damages which are on-going and to be determined at trial.

## COUNT I
## BREACH OF CONTRACT

34.    Each TCC held by plaintiff is a contract with the NYISO which incorporates all provisions of the OATT.

35.    The NYISO violated Attachments X and N and Section 4 of the OATT in connection with the Interconnection Project. Such violations therefore constitute a breach of the provisions of the TCCs held by plaintiff.

### Violation of OATT Attachment X

36.    The NYISO breached Attachment X of the OATT by failing to apply the OATT interconnection procedures to the Interconnection Project. Specifically, the NYISO failed to post the Interconnection Project in the interconnection queue, and to perform feasibility and impact studies required under Attachment X.

37.    Attachment X dictates the process to be followed when the NYISO and a particular developer or owner of an electric power generator wish to interconnect into the NYISO grid.

38.    Under Attachment X, the NYISO and an owner or developer seeking to interconnect in the NYISO grid must take several clearly enumerated steps.

39.    An owner or developer must first submit an "Interconnection Request" (as defined in the OATT) to the NYISO.  The Interconnection Request places the proposed owner into a queue with other project sponsors seeking access to the NYISO grid.  A sponsor's queue position is determined by the date and time of the Interconnection Request.

40.    The NYISO is required to maintain a list of all valid Interconnection Requests on its OASIS website.  The OASIS website must also include detailed information about respective Interconnection Requests, such as where the interconnection will take place, the point of interconnection and the status and anticipated in service date of the interconnection.

41.    Attachment X also prescribes the specific studies which the NYISO must complete and the approximate time frame for completing them.  These studies commence with an Interconnection Feasibility Study which consists of a power flow and short circuit analysis for the proposed points of interconnection, as well as any alternative points of interconnection, and a good-faith estimate of the costs and facilities required to complete the proposed interconnection.

42.    Next, the NYISO completes an Interconnection System Reliability Impact Study and an Interconnection Facilities Study designed to assess the impact of the proposed generator interconnection on the NYISO's transmission system, and the exact facilities and costs required for the interconnection.

43.    For projects which proceed this far, the project sponsor must sign an Engineering and Procurement Agreement with the NYISO, which allows the NYISO to begin working on long lead-time items needed for the interconnection.

44.    Finally, a Large Generator Interconnection Agreement among the NYISO, transmission owner, and developer must be negotiated and signed.

45.     Section 4.4.3 of Attachment X sets forth the methods to be used by a developer to make changes to the data contained in the Interconnection Request. Under this provision, prior to making any changes to the data found in a developer's Interconnection Request, the developer may seek to obtain a determination by the NYISO that the proposed change is not a "material modification." The term "material modification" is defined as "those modifications that have a material impact on the cost or timing of any Interconnection Request with a later queue priority date."

46.     Section 4.4.3 expressly provides that "[a]ny change to the Point of Interconnection . . . shall constitute a Material Modification" as defined in the OATT. Other than certain enumerated exceptions which are inapplicable here, Attachment X does not provide for any other means of bypassing the materiality default of Section 4.4.3.

47.     Upon a finding of a "material modification," the developer may either withdraw the proposed modification, or proceed with a new Interconnection Request for such modification following the steps outlined above. The Interconnection Project clearly constitutes a material modification under Section 4.4.3.

48.     Attachment X also contains a definition of "Interconnection Request" and provides in relevant part as follows:

> Interconnection Request shall mean Developer's request,… to increase the capacity of, or make a material modification to the operating characteristics of, an existing Large Generating Facility…

In interpreting whether the Interconnection Project should have been subject to a new interconnection request and the provisions of Attachment X, it is important to note that once the studies of an interconnection have been completed, a change in the Point of Interconnection is categorically a material modification requiring restudy and inclusion anew in the interconnection

queue. There is no rational basis to treat a new project in the interconnection process differently than an existing generator with respect to the materiality of changing interconnection points long after Attachment X and Section 4.4.3 became effective. Moreover, the Interconnection Project constitutes a material modification to the operating characteristics of the Seymour GTs.

49. The NYISO's consent to the April 2007 reconfiguration of the Seymour GTs breached the above interconnection procedures of Attachment X in at least three different ways.

50. First, the NYISO violated the OATT by finding (or allowing TPAS to find) that the Interconnection Project was not a material modification. The NYISO breached the express terms of Section 4.4.3 of Attachment X which plainly state that with certain exceptions such point of interconnection changes are always material. No exceptions to a finding of materiality applied to the Seymour GT change proposed by the NYPA. Moreover, the Interconnection Project represented a material modification to the operating characteristics of the Seymour GTs.

51. If the NYISO had determined that the Interconnection Project constituted a material modification, then the Interconnection Project would have been subject to the procedures of Attachment X, including all of the study procedures noted above. If this had occurred as it should have, then the project would not have occurred during the term of 330 Fund's TCCs here at issue.

52. Allowing the Interconnection Project to proceed as a non-material modification adversely impacted plaintiff because it drastically changed the amount of congestion in the SI/G Load pocket which deprived it of the value of many of the TCC's the NYISO had awarded it.

53. Second, the NYISO further breached Attachment X by failing to list the Interconnection Project in the interconnection queue on its OASIS website. The interconnection queue maintained by the NYISO provides very important data to market participants and other

parties interested in doing business in the NYISO such as 330 Fund. The information posted on the interconnection queue allows parties such as plaintiff to make prudent business decisions with full knowledge of what other projects are being planned and their expected timeframes. Thus, plaintiff was not provided with crucial data regarding the timing and status of the Interconnection Project.

54.    Third, under Attachment X, only the NYISO is authorized to address all interconnection-related matters and make materiality determinations for proposed interconnection changes. Upon information and belief, the NYISO permitted TPAS to make the determination of non-materiality. As an advisory committee to the NYISO, the TPAS lacked authority to make the determination that the Seymour GT interconnection was a non-material modification. The NYISO breached Attachment X by permitting such a determination, and failing to apply Attachment X to the Interconnection Project.

55.    The NYISO's breach of the Attachment X provisions caused 330 Fund to suffer significant monetary damages.

**Violation of OATT Attachment N**

56.    Attachment N to the OATT also details the NYISO's posting obligations prior to TCC auctions.

57.    Section 3.6.6.1 of Attachment N requires the NYISO to post certain data prior to each TCC auction, including information concerning outages. Specifically, Section 3.6.6.1 requires the NYISO to post tables prior to each TCC auction which detail the expected impact of all transmission facility outages and returns-to-service on interface transfer limits for the period during which TCCs are to be sold in the auction.

58.    The NYISO breached its obligations under Section 3.6.6.1 of Attachment N by failing to post information on the Interconnection Project prior to the relevant TCC auctions.

59.    As a bidder and purchaser in the relevant TCC auctions, plaintiff was deprived of relevant information concerning the Interconnection Project.

60.    The NYISO's breach of the Attachment N disclosure requirements caused plaintiff to incur significant monetary damages.

**Violation of OATT Section 4.0**

61.    The NYISO has the obligation under OATT Section 4 to maintain the OASIS consistent with FERC's regulations.  These regulations require that utilities, including the NYISO, post relevant information to allow market participants to:

> View and download in standard formats, using standard protocols, information regarding the transmission system necessary to enable prudent business decision making;…

Section 4.0 of the OATT incorporates these regulations and establishes the NYISO as the party responsible for satisfying these requirements.

62.    In order to make prudent business decisions, market participants (in this case, TCC auction bidders) must not only have access to relevant information, they must have access to that information in a timely manner before those business decisions must be made.  Through the NYISO's failure to provide information concerning the Interconnection Project, 330 Fund could not make such decisions regarding the bids it would place into the relevant TCC auctions based on actual market conditions.  Rather, 330 Fund was operating under inaccurate assumptions based on the insufficient information the NYISO made available to market participants.  As a result of the lack of information, 330 Fund's TCC bids did not reflect the Interconnection Project.  The NYISO knew or should have known that the relocation of the

interconnection point of the Seymour GTs, would require a line outage which would have an economically significant effect on congestion in the SI/G Load Pocket. The NYISO also knew or should have known that the relocation of the Seymour GTs would have a significant impact on congestion in the SI/G Load Pocket after such outage.

63.    The NYISO's breach of Section 4 posting requirements caused plaintiff to incur significant monetary damages.

## COUNT II
## BREACH OF OATT

64.    Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

65.    Plaintiff asserts a claim for breach of the OATT provisions themselves, including Attachments X and N and Section 4.0 as more fully explained above.

66.    Plaintiff suffered damages as a result of the NYISO's breach of the OATT.

## COUNT III
## NEGLIGENCE

67.    Plaintiff repeats and realleges all preceding paragraphs as if fully set forth herein.

68.    The NYISO knew or should have known that the Interconnection Project would have economically significant effects on congestion in the SI/G load pocket, first through the transmission line outage(s) associated with the project, and second through the relocation of the Seymour GTs into the SI/G Load Pocket.

69.    The NYISO owed market participants, including plaintiff, an independent duty to obtain and post information concerning the Interconnection Project.

70.    The NYISO breached this duty when it became aware of the Interconnection Project in April of 2006 and permitted it to occur without providing information to market participants, including plaintiff.

71.    Plaintiff suffered damages as a result of the NYISO's negligence in failing to post information concerning the Interconnection Project.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment in its favor against defendant in an amount to be determined at trial together with interest, costs, disbursements, and attorneys' fees, and such other relief as this Court deems just and proper.

Dated:  New York, New York
         June 29, 2007

                                        WHITE & CASE LLP

                                        By: _____
                                            J. Christopher Shore
                                            Stuart A. Caplan
                                            Jonathan Beemer
                                            1155 Avenue of the Americas
                                            New York, New York  10036
                                            (212) 819-8200

                                            Attorneys for Plaintiff

SIR:

PLEASE TAKE NOTICE that a ..................
of which the within is a true copy, has
been made herein and was duly entered
and filed in the office of the Clerk of the
..................................................
..................................................
..................................................
on the ...............day of ....................
20 ...............

Attorneys for ....................

**WHITE & CASE**
LIMITED LIABILITY PARTNERSHIP
1155 Avenue of the Americas
New York, New York 10036-2787

To ..................

Attorney for ....................

---

INDEX NO.

SUPREME COURT OF THE STATE OF
NEW YORK, COUNTY OF NEW YORK

330 FUND I, LP,

PLAINTIFF,

-against-

NEW YORK INDEPENDENT SYSTEM
OPERATOR, INC.,

DEFENDANT.

**SUMMONS & COMPLAINT**

COPY

**WHITE & CASE**
LIMITED LIABILITY PARTNERSHIP

**ATTORNEYS FOR PLAINTIFF**
1155 Avenue of the Americas
New York, New York 10036-2787
212-819-8200

TO ..................

ATTORNEY FOR ..................